**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTINE QUARRICK,** | : | |
| **Plaintiff** | : | **No. 2:17-cv-00685** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **MEGAN J. BRENNAN, POSTMASTER** | : | |
| **GENERAL, UNITED STATES POSTAL** | : | |
| **SERVICE,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the Court is Defendant Megan J. Brennan, Postmaster General, United States

Postal Service ("Defendant")'s motion for summary judgment.  (Doc. No. 45.)  For the reasons

that follow, the Court will grant the motion.

## I.  BACKGROUND[1]

Plaintiff Christine J. Quarrick ("Plaintiff") began her employment with the United States

Postal Service ("USPS") on September 20, 2003, as a Part Time Flexible ("PTF") City Carrier

Technician.  (Doc. No. 47 ¶¶ 1-2.)  In 2013, Plaintiff bid for and was awarded the position of

full-time City Letter Carrier ("T-6 Floater") in the Post Office located at 115 North Arch Street,

Connellsville, Pennsylvania 15425, which she held until her formal retirement on or about

November 14, 2018.  (Id. ¶¶ 3-4; Doc. No. 53 ¶ 3.)  T-6 Floaters "case and deliver" mail along

five different routes as a backup to letter carriers who are absent.  (Doc. No. 47 ¶ 5.)

---

[1] The following relevant facts of record are taken from Defendant's Concise Statement of
Undisputed Material Facts ("CSUMF") (Doc. No. 47), Plaintiff's Response to Defendant's
Concise Statement of Undisputed Material Facts and Additional Material Facts ("Response")
(Doc. No. 53), and Defendant's Counterstatement of Additional Material Facts
("Counterstatement") (Doc. No. 60), and are undisputed unless otherwise noted.  The CSUMF,
Response, and Counterstatement contain specific citations to the record at each numbered
paragraph.

The Job Description for a T-6 Floater describes the "Functional Purpose" of the position as follows: "[a]s principal carrier for a designated group of not less than five letter routes, delivers mail on foot or by vehicle on the routes during the absence of the regularly assigned carrier and provides job instruction to newly assigned carriers." (Id. ¶ 6.) The Job Description also states that among other "duties and responsibilities," a T-6 Floater must be able to "serve[] any route in his group during absence of the regular carrier and perform[] complete and customary duties of a carrier (city or special)." (Id. ¶ 7.) T-6 Floaters may be assigned a combination of: "(a) 'park and loop,' routes, which require[] the carrier to park at a designated location and walk with his or her satchel to deliver mail on foot, and (b) 'mounted routes,' which allow[] a carrier to stay in his or her truck and deliver mail curbside. 'Park and loop' routes require more walking than do 'mounted routes.'" (Id. ¶ 8.) When Plaintiff initially bid on the T-6 Floater position, she was assigned to the following delivery routes: City Route 8, City Route 9, City Route 11, City Route 12, and City Route 13. (Id. ¶ 9.) Plaintiff was assigned to the following routes at the time of her retirement: City Route 4, City Route 9, City Route 10, City Route 11, and City Route 12. (Id. ¶ 10; Doc. No. 53 ¶ 10.)

City Routes 4 and 12 have both "park and loop" and "mounted sections," but are "mostly mounted" routes; City Route 9 is an entirely "park and loop" route; City Route 10 has both "park and loop" and "mounted" sections; and City Route 11 is a "mounted loop" route. (Doc. No. 47 ¶ 11.) Because of the number of routes a T-6 Floater must master, the position is "objectively harder than just doing one route," and, therefore, T-6 Floaters are paid a higher salary than a regular letter carrier. (Id. ¶¶ 12-13.) Despite the fact that T-6 Floaters have to "be able to do five different routes . . . the other job responsibilities [of a T-6 Floater are] . . . largely the same as a [Carrier Technician] with one route." (Id. ¶ 14.)

The Postmaster at the Connellsville Post Office, Frederick Reynolds, III ("Postmaster Reynolds") described the Carrier Technician position in a sworn affidavit as follows:

> Delivers and collects mail on foot or by vehicle under varying road and weather conditions in prescribed area; maintains professional and effective public relations with customers and others, requiring a general familiarity with postal laws, regulations, and products . . . of the area. May be required to carry mail weighing up to 35 pounds in shoulder satchels or other equipment and to load or unload containers of mail weighing up to 70 pounds.

(Id. ¶ 15.) Postmaster Reynolds also identified additional functions of a Carrier Technician, including:

> A. Routes or cases all classes of mail in sequence of delivery along an established route. Rearranges and relabels cases as required.
>
> B. Withdraws mail from the distribution case and prepares it in sequence for efficient delivery by him/herself or a substitute along an established route. Prepares [sic] separates all classes of mail to be carried by truck to relay boxes along route for subsequent delivery.
>
> C. Handles undeliverable mail in accordance with established procedures.
>
> D. Delivers mail along a prescribed route, on foot or by vehicle, on a regular schedule, picking up additional mail from relay boxes as needed. Collects mail from street letter boxes and accepts letters from mailing from customers; on certain routes may deliver mail that consists exclusively of parcel post, or the collection of mail.

(Id.)

In a sworn EEO affidavit, Plaintiff described her work-related duties in the following way:

> lifting and carrying up to 70 pounds per day; sitting and standing up to eight hours per day; climbing for up to eight hours per day; kneeling up to eight hours per day; stooping up to eight hours per day; twisting up to eight hours per day; pulling and pushing materials up to eight hours per day; grasping materials up to eight hours per day; manipulation, including keyboarding, operating machinery and reaching above the shoulders up to eight hours per day; and driving a vehicle up to eight hours per day.

(Id. ¶ 16.)

During her deposition, Plaintiff described her job responsibilities as a T-6 Floater as including:

> lifting and carrying up to 70 pounds per day, sitting and standing for up to eight hours per day; climbing for up to eight hours per day; kneeling for up to eight hours per day; stooping for up to eight hours per day; twisting for up to eight hours per day; pulling and pushing materials for up to eight hours per day; grasping materials for up to eight hours per day; and delivering in inclement weather, including in ice and snow.

(Id. ¶ 17.)

Plaintiff suffered two injuries while on the job sometime in the Spring of 2007, resulting in damage to both of Plaintiff's knees. (Doc. No. 53 ¶ 92.) In October 2007, Plaintiff was diagnosed with a chondral fracture of the right knee, a lateral collateral ligament sprain, and osteoarthritis. (Doc. No. 47 ¶ 18.) Plaintiff also suffered a torn meniscus in her left knee. (Doc. No. 53 ¶¶ 92-93.) Plaintiff's knee injuries have resulted in a number of workplace restrictions since 2007, as described in a number of Duty Status Reports (or "CA-17s"), completed by Plaintiff's physicians and submitted by Plaintiff. (Doc. No. 47 ¶ 19.) Plaintiff's medical restrictions have varied throughout the years. (Doc. No. 53 ¶ 95.)

Plaintiff's March 3, 2015 Duty Status Report restricted Plaintiff to: lifting ten (10) pounds or less for five hours per day; walking and twisting one half hour a day; and sitting six hours a day. Further, it prohibited Plaintiff from climbing, kneeling, bending, pulling, or pushing. (Doc. No. 47 ¶ 20.) Plaintiff was also not permitted to use steps in icy conditions or to work overtime. (Id.) Plaintiff's June 10, 2016 Duty Status Report limited Plaintiff to: (1) lifting ten (10) pounds continuously and twenty (20) pounds intermittently; (2) sitting six hours per day; (3) walking one half hour a day; (4) bending one half hour a day; (5) pushing/pulling one half hour a day; and (6) climbing two hours a day. (Id. ¶ 21.) A physician's note attached to the June 10, 2016 Duty Status Report also stated "no continuous walking such as house to house." (Id.)

A June 22, 2016 Duty Status Report submitted by Plaintiff permitted her to: (1) lift ten (10) pounds continuously and twenty-eight (28) pounds intermittently; (2) climb stairs up to two hours per day; and (3) walk for two hours per day.  (Id. ¶ 22.)

In a sworn EEO affidavit, Plaintiff described her physical limitations in the following way:

> I am restricted to the following activities: lifting and carrying up to twenty-eight (28) pounds continuously up to five (5) hours per day; lifting and carrying up to 28 pounds up to [five] 5 hours per day; sitting continuously for up to six (6) hours per day; standing up to eight hours per day; walking intermittently up to two (2) hours per day; climbing intermittently up to 2 hours per day; bending and/or stooping for [up] to half an hour per day; twisting intermittently for up to eight hours per day; grasping material up to eight hours per day; manipulation, including keyboarding, operating machinery and reaching above the shoulders up to eight hours per day; driving a vehicle up to eight hours per day.

(Id. ¶ 23.)  Plaintiff also stated in the same affidavit that she is "not permitted to push and/or pull equipment on uneven surfaces or inclines," nor is she permitted to engage in "continuous walking such as house-to-house" or use "occasional steps for mail delivery";  further, she must "load [her] vehicle from ground level."  (Id. ¶ 24.)

Plaintiff has stated that because of her medical conditions, her "mobility is limited" and she can neither "walk or run for extended period[s]" of time nor "engage in any activity which requires kneeling," and that those medical conditions are "permanent in nature until such time as [her] knees are replaced."  (Id. ¶¶ 25-26.)  Plaintiff has described her physical limitations as follows:

> Right Knee – Mitochondral fracture, torn meniscus, popliteal cyst, ganglion cyst, arthritis, knee caps not tracking properly, work cartlidge, degeneration
>
> Left Knee – Significant arthritis, torn meniscus, bone on bone, popliteal cyst, degeneration
>
> I walk with a limp, have trouble ascending and descending steps, stooping, and kneeling.  Sometimes my left knee locks up when I sit down and it has to "pop"

before I can bear weight on it again. I cannot walk far before stopping. At my last examination at the work comp doctor's office, he told me I have lost 10 degrees extension, and 10 degrees flexation. I believe that was in 2015. My knee caps do not track properly, and I frequently stumble.

(Id. ¶ 27.)

Postmaster Reynolds became Postmaster of the Connellsville Post Office in or around 2012. (Doc. No. 53 ¶ 95.) Plaintiff maintains that, at the time Postmaster Reynolds assumed that position, he was informed of Plaintiff's condition and her need for accommodations. (Id. ¶ 96.) However, Defendant disputes this statement, pointing to Postmaster Reynolds' testimony that he was unaware of accommodations provided to Plaintiff before he became Postmaster. (Doc. No. 60 ¶ 96.) Defendant admits that it accommodated Plaintiff between 2007 and 2012. (Id. ¶ 97.)

Defendant maintains that "Plaintiff admitted at her deposition that she cannot perform her regular duties as a T-6 Floater." (Doc. No. 47 ¶ 28.) Plaintiff disputes this statement, maintaining that while she confirmed at her deposition that she "could not perform certain duties assigned to her as a T-6 floater . . . [a]t no time did [she] admit that she could not perform all, or even substantially all, of her job duties." (Doc. No. 53 ¶ 28.) In a sworn affidavit, Postmaster Reynolds described Plaintiff's ability to perform her job duties as follows:

> [Plaintiff] is a T-6 (Floater). She is paid a higher level than the regular carriers due to she is required to work 5 different routes . . . not just 1. This office is made up of park and loop routes with the exceptions of City 4, 11 and 12. City 4 [Plaintiff] must give away 45 min to 1 hour, depending on the mail volume, due to [the fact that it requires] walking and she has restrictions. City 9 she can only case. It is all park and loop. City 10 she can only do the NDCBU's located in Gibson Terrace and that takes between 20-30 min. The rest is park and loop. City 12 she has to give away 2 hours because there is walking. While her restrictions state that she can walk for up to 2 hours, it restricts her from walking "House to House." City 11 is the only route [Plaintiff] can do with assistance providing there is not a parcel over 28 lbs.

(Doc. No. 47 ¶ 29.)

While acknowledging that Postmaster Reynolds' testimony is as stated, Plaintiff purports to dispute any assertion that she could not deliver mail on all five (5) of the routes to which she was assigned. (Doc. No. 53 ¶ 29.) However, Plaintiff admitted that, while she was assigned to City Routes 4, 9, 10, 11, and 12, she could deliver only a portion of the required deliveries along City Routes 4, 10, and 12, and that she was physically unable to deliver any mail along City Route 9. (Doc. No. 47 ¶ 30.) Plaintiff further admitted that, with regard to the five routes, while she "keep[s] the mounted parts, the apartments," she has asked other carriers to deliver mail along the "park and loop" parts of the routes. (Id. ¶ 31.)

On or about November 17, 2014, Postmaster Reynolds sent an email to his direct supervisor and Post Office Operations Manager ("POOM"), Curtis Williams ("Mr. Williams"), wherein he identified Plaintiff as an employee who was "physically unable to do [her job]," and asked "[h]ow are we able to force [her] hand with getting a disability or seeking another job within the postal service?" (Doc. No. 53 ¶¶ 98-99.) Postmaster Reynolds admitted at his deposition that his email to Mr. Williams was an attempt to determine if Plaintiff could be forced to leave the Connellsville Post Office either through retirement or reassignment to another duty station. (Id. ¶ 100.) Postmaster Reynolds sent another email to Mr. Williams on or about January 12, 2015, stating that "Quarrick is next," and that he planned to consult with Kim Sample, USPS head nurse ("Ms. Sample"), regarding Plaintiff's medical restrictions and their relationship to Plaintiff's ability to perform her job functions. (Id. ¶ 101.) Thereafter, on or about March 5, 2015, Postmaster Reynolds sent an email to Ms. Sample stating "I am trying to remove [Plaintiff] from her bid and at least make her an unassigned regular. Are you able to help me with this?" (Id. ¶ 102.) At his deposition, Postmaster Reynolds attempted to clarify the motivation behind his emails, stating that he wanted to reassign Plaintiff to another position so

that she would be able to work within her medical restrictions and so that all of Plaintiff's routes would be covered. (Id. ¶ 103.) Postmaster Reynolds testified that he did not know "exactly" what work would be available to Plaintiff as an unassigned regular employee. (Doc. No. 60 ¶ 104.) He also testified that he sought the change to using a T-6 Floater who could perform all duties of the position so he did not have to find other carriers to cover some aspects of Plaintiff's routes. (Id.)

On or about October 27, 2015, Postmaster Reynolds emailed Labor Relations Specialist Dean Petros ("Mr. Petros"), stating that Plaintiff was "unable to perform [her] duties" and asking Mr. Petros to confirm that he can "put her swing up for bid." (Id. ¶ 105.) At his deposition, Postmaster Reynolds stated that Plaintiff's position had to be put up for bid so that her routes would be covered. (Id. ¶ 106.) At the time, certain sections of Plaintiff's routes were being covered by other carriers. (Id. ¶ 107.) Postmaster Reynolds testified that it was a "pain" to find Plaintiff work within her medical restrictions and that his need to ensure that other carriers were available to cover Plaintiff's routes made his job "harder." (Id. ¶ 108; Doc. No. 60 ¶ 108.) Plaintiff testified that various other employees told her that Postmaster Reynolds referred to her as "a piece of shit" and/or "a pain in the ass" outside of her presence. (Doc. No. 53 ¶ 109.) While admitting that Plaintiff so testified, Defendant "denies that those hearsay statements are true." (Doc. No. 60 ¶ 109.)

On or about November 4, 2015, shortly after Postmaster Reynolds emailed Mr. Petros, Postmaster Reynolds presented Plaintiff with an Offer of Modified Assignment. (Id. ¶ 110.) This was an offer of a limited duty assignment as a clerk in the Uniontown Post Office with job responsibilities including sorting small parcels and other mail, and which required only the

ability to sit, stand, and lift ten (10) pounds.[2] (Doc. No. 47 ¶ 35.)  Defendant maintains that

Postmaster Reynolds offered Plaintiff the position because of her medical restrictions and the

lack of available work she could perform.  (Id.)  Plaintiff disputes this assertion, maintaining that

Postmaster Reynolds provided "separate and distinct reasons for presenting" Plaintiff with the

offer, including "the claim that Plaintiff failed to deliver packages;  the claim that Plaintiff's

ability to perform her job duties had decreased over time;  and the claim that Plaintiff

intentionally exceeded her own medical restrictions while employed at the Connellsville Post

Office," all of which Plaintiff maintains were false.  (Doc. No. 53 ¶ 35.)  The position

contemplated reducing Plaintiff's hours to only twenty-five (25) hours a week, instead of forty

(40); however, she would receive workers' compensation benefits related to the hours she was

unable to work due to injury.  (Doc. No. 47 ¶ 36.)[3]

---

[2]  The Federal Employees' Compensation Act ("FECA") provides for payment of workers' compensation benefits to civilian officers and employees of the federal government.  See Doc. No. 47 ¶ 32; 20 C.F.R. § 10.0.  FECA, in turn, is administered by the Department of Labor's Office of Workers' Compensation Programs ("OWCP"), which provides for limited duty jobs to accommodate employees with compensable job-related injuries.  See Doc. No. 47 ¶ 33; 20 C.F.R. § 10.507.  Accordingly, pursuant to FECA, USPS employees who temporarily cannot perform their duties due to serious illness or injury may be eligible for a "limited duty" assignment, which permits such employees to continue working in a functional capacity as long as they do not exceed their physical limitations.  (Doc. No. 47 ¶ 34.)

[3]  While in her Response Plaintiff characterizes this assertion as a "conclusion of law," the hours associated with the limited duty assignment and the payment of workers' compensation benefits are facts of record.  (See Doc. Nos. 48-2 at 25-36; 47 ¶ 55; 53 ¶ 55.)  Further, Plaintiff's additional response indicating that she is "without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations . . . [t]herefore, the same are denied" does not operate as an effective denial of the facts asserted pursuant to Local Rule 56C of this Court, which requires a responsive statement to set forth "the basis for the denial of any fact contained in the moving party's Concise Statement of Material Facts [that] is not admitted in its entirety . . . with appropriate reference to the record."  See LCvR 56C1.b.  Accordingly, as Plaintiff's Response fails to dispute these facts properly, the facts set forth in paragraph 36 will be deemed admitted for purposes of this summary judgment motion.  See LCvR 56E (stating that "[a]lleged material facts set forth in the moving party's Concise Statement of Material Facts will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied").

Plaintiff testified that Postmaster Reynolds told her, in addition to other union officers, that he offered her the opportunity to transfer to Uniontown because she "wasn't delivering any of [her] packages," and that she was "extending [her] routes and giving away too much of each route," because she "couldn't do the walking part." (Id. ¶ 37.) Further, Plaintiff testified that Postmaster Reynolds later stated that he offered her a clerk position at Uniontown "because [she] was exceeding [her] own medical restrictions." (Id. ¶ 38.)[4] In a January 7, 2016 email, Postmaster Reynolds stated that he had offered Plaintiff the clerk position in Uniontown so that she could work within her medical restrictions and that, despite Plaintiff's stated desire to return to the Connellsville office as a carrier, he had concerns that she would exceed her medical restrictions and injure herself if she continued performing the duties of a carrier. (Doc. No. 47 ¶ 39.)[5]

Plaintiff testified that, prior to offering her the position as a clerk at the Uniontown Post Office, Postmaster Reynolds told Plaintiff that she was a "pain in his ass," and that during the same conversation, Plaintiff made a self-deprecating remark, referring to herself as a "piece of shit, pain in the ass, something like that." (Id. ¶ 40.)[6] Postmaster Reynolds testified that he

---

[4] With regard to the reasons proffered by Postmaster Reynolds concerning the proposed limited duty assignment – Plaintiff's failure to deliver packages, Plaintiff's practice of giving away a portion of each route to other carriers, and the fact that Plaintiff was exceeding her medical restrictions – while Plaintiff admits that she so testified, she maintains in her Response that "the truth of Postmaster Reynolds' explanation is denied," pointing to her deposition testimony wherein she denies that those reasons were true. (Doc. No. 53 ¶¶ 37-38.)

[5] While Plaintiff admits that Postmaster Reynolds' email reads as stated, she denies that she "was unable to perform her job duties without violating her medical restrictions," pointing to her deposition testimony. (Id. ¶ 39.)

[6] Plaintiff further states that the remark was made "sarcastically and in direct response to various other employees informing her that Postmaster Reynolds referred to [her] as a 'piece of shit' and/or 'a pain in the ass' behind her back." (Id. ¶ 40.)

stated, in the context of a conversation with Plaintiff, that "it is a pain to find her work" within her medical restrictions, and that, during the same conversation, Plaintiff referred to herself as a "piece of crap of something to that effect." (Id. ¶ 41.)

Plaintiff maintains that she accepted the offer to work at the Uniontown Post Office in a modified clerk position "under duress," as Postmaster Reynolds gave her only three days within which to accept the position, instead of ten days required under the terms of the collective bargaining agreement governing her employment. (Id. ¶ 42.)[7] Soon after accepting the position at the Uniontown Post Office, on or about November 15, 2015, Plaintiff filed an EEO complaint,[8] alleging that she was dissatisfied with the process through which she was offered the position and stating that she "was never given a page 2, never given an explanation of the assignment, never given an opportunity to have [her] doctor review anything, and never given union representation when [she] requested it," and that she desired reinstatement to the Connellsville Post Office "with [reasonable] accommodations, or another permanent bid that would accommodate [her] medical limitations." (Id. ¶ 43; Doc. No. 53 ¶ 114.) At the time she filed her EEO complaint, Plaintiff also filed a labor grievance in connection with the Uniontown Post Office offer, maintaining that it violated the collective bargaining agreement's prohibition on "crossing crafts" for a limited duty assignment. (Doc. No. 47 ¶ 44.) After the filing of Plaintiff's grievance and EEO complaint, Postmaster Reynolds stated to Labor Relations Specialist Brandon Gardner ("Mr. Gardner") that "there [is] not a route in this office that she can do." (Doc. No. 53 ¶ 115.)

---

[7] Plaintiff further states that she accepted the offer in an attempt to safeguard her workers' compensation benefits. (Doc. No. 53 ¶ 113.)

[8] The record reflects that Plaintiff contacted an EEO counselor in November of 2015 and filed a formal complaint on February 10, 2016. (Doc. No. 48-2 at 67.)

On or about June 7, 2016, Plaintiff's grievance was resolved by way of a pre-arbitration settlement agreement that provided that Plaintiff would be reinstated as a full-time city carrier assigned to the Connellsville Post Office no later than June 18, 2016.  (Id. ¶ 117.)  The settlement agreement contained the following terms and conditions:  "[t]he grievant is to be returned to the Connellsville Installation as a full time city carrier and resume her carrier duties within her medical restrictions and in accordance with controlling provisions in Article 13 of the Collective Bargaining Agreement."  (Doc. No. 47 ¶ 45.)

Thereafter, on or about June 9, 2016, Mr. Williams stated to Mr. Gardner that the Connellsville Post Office could not provide Plaintiff with more than one (1) hour of work per her medical restrictions.  (Doc. No. 53 ¶ 118.)  At the time Mr. Williams made this statement, he had not yet received Plaintiff's updated medical restrictions; accordingly, he was relying only on what he had been told by Postmaster Reynolds.  (Id. ¶ 119.)

On June 18, 2016, the USPS made a second "Offer of Modified Assignment (Limited Duty)," to Plaintiff, which contained the option of working in a modified position as a full-time letter carrier at the Connellsville Post Office.  (Doc. No. 47 ¶ 46.)  Plaintiff was reinstated to the Connellsville Post Office on or about that same date.  (Doc. No. 53 ¶ 120.)  Postmaster Reynolds testified that he was "displeased" by Plaintiff's reinstatement to the Connellsville Post Office because Plaintiff could not perform the duties of a T-6 Floater.  (Doc. No. 47 ¶ 47.)  Plaintiff testified that, upon her return to the Connellsville Post Office, Postmaster Reynolds was "curt" and "not as friendly" toward Plaintiff.  (Doc. No. 60 ¶ 122.)  Plaintiff testified that Postmaster Reynolds did not provide her with all work within her medical restrictions.  (Id. ¶ 123.)  Plaintiff testified that, some time after she returned to work at the Connellsville Post Office, she was injured while pushing a loaded mail hamper through the parking lot, and she learned from a

union steward that management was concerned that in doing so, she had violated her own work restrictions, which prohibited her from pushing or pulling. (Doc. No. 47 ¶ 49.)[9]

On July 21, 2016, USPS made a third "Offer of Modified Assignment (Limited Duty)" to Plaintiff that would have permitted Plaintiff to work in a modified position as a City Letter Carrier from 10:30 AM to 6:00 PM Sunday through Wednesday, performing the duties of casing mail, express mail delivery, mounted mail delivery, and collections, and involving the physical demands of: standing, driving, and walking (though not house to house). (Doc. No. 47 ¶ 50.) Plaintiff did not accept the above offer, testifying that the offered position would have required that she "cross crafts into the rural craft" and that the offer was withdrawn because the rural union raised concerns about the assignment. (Id. ¶ 51.)

Thereafter, on July 29, 2016, USPS made a fourth "Offer of Modified Assignment (Limited Duty)" to Plaintiff that would: permit Plaintiff to work in a modified position as a City Letter Carrier from 7:30 AM to 4:00 PM; limit her duties to "standing casing mail," "mail delivery mounted only," and "collections;" and limit her routes to City Routes 4, 11, and 12. (Id. ¶ 52.) Plaintiff accepted the July 29, 2016 Offer while noting that, pursuant to the terms of the offer, she would no longer deliver mail along City Routes 2 and 9, and expressing her concern that she would not have sufficient work within her physical limitations. (Id. ¶ 53.)[10] Plaintiff testified that once she was placed in USPS's Limited Duty Program she received workers'

_____

[9] Plaintiff clarifies that her medical restrictions at the time of the incident "erroneously stated that she was unable to push or pull," and that she subsequently "submitted a corrected CA-17 which permitted her to push and pull." (Doc. No. 53 ¶ 49.)

[10] Plaintiff further notes that she specifically questioned Postmaster Reynolds about his practice of "pivoting out" available tasks, including delivering Express Mail and double casing routes, to junior carriers before assigning such tasks to Plaintiff. (Id. ¶ 53.)

compensation benefits in the amount of 75 percent of her regular pay tax-free for every hour she was unable to work due to her injury, up to 40 hours per week.  (Doc. No. 47 ¶ 55.)[11]

On or about August 9, 2016, Plaintiff's union representative contacted a Labor Relations Specialist named Daniel Traficanti ("Mr. Traficanti") to lodge a complaint that management was not assigning to Plaintiff all work within her restrictions.  (Id. ¶ 56.)  Thereafter, Mr. Traficanti sent an email to Postmaster Reynolds and other USPS management, which stated that, in connection with the USPS Limited Duty Program "we are obligated to provide any carrier work within [Plaintiff's] restrictions on a daily basis," and that Plaintiff's complaint, if true, "appear[s] to be in violation of a pre-arbitration settlement."  (Id.)  At his deposition, Mr. Traficanti testified to his participation in several telephone calls and meetings with Mr. Williams and Postmaster Reynolds in an effort to advise them regarding Defendant's responsibilities pursuant to the settlement agreement to provide Plaintiff with all available work within her medical restrictions. (Doc. No. 53 ¶ 131.)

During her deposition testimony, Plaintiff admitted that Defendant accommodated her physical limitations by allowing her to deliver mail only along routes that do not require walking and testified that the gravamen of her complaint relates to Defendant's purported failure to provide her with 40 hours of work per week between August 2016 and July 2017 while Plaintiff was working under the July 29, 2016 Offer of Modified Assignment.  (Doc. No. 47 ¶¶ 61-62.)[12] Plaintiff believes that, under the governing collective bargaining agreement, Defendant was

---

[11] Plaintiff further notes that her annual leave, thrift savings plan, and social security contributions were all negatively impacted by any reduction in her hours despite her receipt of workers' compensation benefits in the amount of 75 percent of her regular salary. (Doc. Nos. 53 ¶¶ 55, 138; 60 ¶ 138.)

[12] Plaintiff also testified that she was not provided with work within her medical restrictions when that work was available.  (Doc. No. 53 ¶¶ 61-62.)

obligated to "give [her] 40 hours before they provide 40 hours" to other employees.  (Doc. No. 47 ¶ 63.)

On December 15, 2016, Plaintiff filed a second EEO complaint alleging that she was discriminated against as a result of her disability and retaliated against for filing her prior EEO complaint.  (Id. ¶ 57.)  The EEO complaint alleged that, as a result of changes to Plaintiff's schedule, her work hours were reduced from forty (40) hours a week to approximately twenty-five (25) hours a week.  (Id. ¶ 58.)

In a sworn EEO Affidavit, Postmaster Reynolds attested that he attempted to provide Plaintiff with all available work within her physical limitations, stating that:

> [t]he office has been trying to keep Ms. Quarrick gainfully employed for eight hours a day but each day is different.  When the situation permits, we have her [do] collections, place up case labels, run express mail if it is here, deliver mis-thrown parcels, whatever we can but if there is nothing here we have to send her home.  We have even had her perform custodial duties on Thursday [because] this is the day off of the regular custodian.  Ms. Quarrick has walking restrictions and this office has only one full mounted route that she can complete.  When the situation permits and there is available mounted work from a route that has a CCA work, it is given to her but that time is no more than about 1 hour.

(Id. ¶ 64.)  Postmaster Reynolds also stated the following in email correspondence related to the resolution of Plaintiff's EEO complaint:

> There is not 40 hours of work available within her restrictions.  We have just about all park and loop routes in this office.  She can only do 1 route ([C]ity 11) without needing assistance. . . . Her paperwork states that she cannot walk house to house.  If I can pivot the office casing that's what I do.

(Id. ¶ 65.)  With regard to the above sworn statement and email correspondence, while Plaintiff admits that Postmaster Reynolds' statement and email correspondence read as stated, she denies the truth of the facts contained within those statements, pointing to her own deposition testimony.  (Doc. No. 53 ¶¶ 64-65.)

In her sworn EEO Affidavit, Plaintiff averred that "Mr. Reynolds replaced job duties that were not within my medical restrictions with those that were by allowing me to perform mounted floats instead of walking floats," and that "Mr. Reynolds and Mr. Williams have continuously informed me that they cannot provide me with 40 hours of work per week because there is not enough work within my limitations." (Id. ¶¶ 66-67.) Plaintiff also attested that "Mr. Reynolds refused to allow me to perform other job duties, such as double casing, delivering Express Mail, and delivering parcels, that were clearly within my medical restrictions." (Id. ¶ 68.) Plaintiff described "casing" as removing mail from bins, called "hods," and placing mail in a "delivery sequence" along a given route; she described "double casing" as "casing" mail for two routes. (Id. ¶ 69.)

In his sworn EEO Affidavit, Postmaster Reynolds stated that he could not assign Plaintiff the task of double casing because that task "would require her to start earlier than her scheduled start time of 07:30" and "[o]ne of Ms. Quarrick[']s restrictions is 'No Overtime.'" (Id. ¶ 70.) While admitting that Postmaster Reynolds so averred, Plaintiff disputes the truth of this statement, maintaining that she was permitted to work overtime pursuant to the relevant CA-17. (Doc. No. 53 ¶ 70.)[13] At his deposition, Postmaster Reynolds explained that he also did not assign Plaintiff the task of double casing because she took longer to "complete the task than

---

[13] In support of this position, Plaintiff cites her deposition testimony wherein she testified as follows with respect to June 22, 2016:

    Q    So understood that you're saying that you don't think you had a medical
         restriction anymore about overtime as of that date?
    A    Correct.

(Doc. No. 48-1 at 63, Quarrick Dep. at 247:21-24.) In further support of her position, Plaintiff references "Exhibit E;" however, Exhibit E submitted in support of Plaintiff's Counterstatement is not a CA-17 reflecting Plaintiff's ability to work overtime as of June 22, 2016, but instead is Plaintiff's acceptance of the July 29, 2016 Offer of Modified Assignment. (Doc. No. 54-5.) In any event, regardless of whether Plaintiff was able to work overtime on the identified date, nothing in the record supports a conclusion that Postmaster Reynolds was aware of that fact and still refused to assign Plaintiff the task of double casing.

other carriers," and he stated as such in an August 9, 2016 email to Mr. Traficanti, writing, "[a]s far as double casing she is not a really good caser. I can't see her casing two routes and getting out of the office without me having to give away more of the route than she can carry." (Doc. No. 47 ¶¶ 71-72.) Again, while admitting that Postmaster Reynolds so stated, Plaintiff disputes the truth of Postmaster Reynolds characterization, maintaining that he admitted "that his impression that the Plaintiff was 'not very good' at casing was based on his personal observation of the Plaintiff's casing skills on approximately two (2) occasions over the course of approximately four (4) years." (Doc. No. 53 ¶¶ 71-72.)

With regard to the task of delivering Express Mail, Postmaster Reynolds stated in a sworn affidavit that USPS management does not "know how many and when the express mail will arrive," and, therefore, assigning this task to Plaintiff would require her to experience downtime while waiting for arrivals. (Doc. No. 47 ¶ 73.)[14] During his deposition, Postmaster Reynolds again stated that management does not "know when Express Mail is coming in and it has to be delivered by noon," and further explained that if Plaintiff was in the Post Office when Express Mail came in, she would be assigned to deliver that mail. (Id. ¶ 74.) In response, while admitting that Postmaster Reynolds so testified, Plaintiff disputes the truth of his statement, maintaining that Postmaster Reynolds assigned Express Mail deliveries to other carriers (and even the custodian) rather than to Plaintiff, more than once, pointing to her deposition testimony

---

[14] While admitting that Postmaster Reynolds testified as stated, Plaintiff further responds by stating that she is "without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations . . . [t]herefore the same are denied." (Doc. No. 53 ¶ 73.) As discussed supra in note 3, Plaintiff's Response does not operate as an effective denial of the facts asserted pursuant to Local Rule 56C of this Court. Accordingly, because Plaintiff's Response fails to properly dispute the fact set forth in paragraph 73, those facts will be deemed admitted for purposes of this summary judgment motion. See LCvR 56E (stating that "[a]lleged material facts set forth in the moving party's Concise Statement of Facts will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied").

to that effect.  (Doc. No. 53 ¶ 74.)  Plaintiff admitted that delivering Express Mail is unpredictable, and that, if she were out on an all-day run delivering mail, she would be unable to deliver Express Mail.  (Id. ¶ 75.)[15]

Postmaster Reynolds explained in his EEO Affidavit that parcels were delivered by the carriers assigned to the route and Plaintiff's restrictions on lifting and walking interfered with her ability to perform this task.  (Doc. No. 47 ¶ 76.)[16]  Postmaster Reynolds testified during his deposition that "if the parcels were available for her to deliver within her medical restrictions, we would have given it to her, but if they're assigned to another route, I'm just not going to take them off of another route."  (Id. ¶ 77.)[17]  Plaintiff admitted during her deposition that generally, parcels are delivered by the carrier assigned to a particular route, but there may be additional parcels that she could deliver if a carrier is overburdened on a given day.  (Id. ¶ 78.)  Plaintiff also testified that parcels would not be assigned for delivery until after her departure from the Connellsville Post Office for the day.  (Doc. No. 53 ¶ 79.)

Plaintiff admitted that after filing her EEO complaint in December 2016, her hours increased to approximately forty (40) hours of work each week and that she worked at least forty (40) hours or more during the 2016 holiday season.  (Id. ¶¶ 80-81.)  Plaintiff's Time and

[15] Plaintiff further testified that she was not permitted to deliver Express Mail more than once when she was available to deliver it.  (Doc. No. 53 ¶ 75.)

[16] Plaintiff admits that Postmaster Reynolds so averred, but she disputes the truth of his statement, pointing to her deposition testimony that parcels could be redistributed to other carriers if the carrier assigned to the route was overburdened and was, therefore, unable to deliver parcels without overtime.  Plaintiff further testified that a parcel could be delivered by a carrier who was not regularly assigned to a route if a carrier from another office was covering the route, and the Postmaster wanted someone more familiar with the route to deliver the parcels on the route.  (Id. ¶ 76.)

[17] While admitting that Postmaster Reynolds so testified, Plaintiff disputes the truth of his statement, pointing to her deposition testimony that she was not permitted to deliver Express Mail on more than one occasion despite her availability to do so.  (Id. ¶ 77.)

Attendance Collection System (TACS) report from the time period between June 25, 2016 and December 2016 reflects that Plaintiff worked eight (8) hour days or more but on some days worked fewer than eight (8) hours. (Id. ¶ 82.)[18] Plaintiff tore her rotator cuff on June 26, 2017 and was out of work from that date until May of 2018. (Id. ¶ 83.)

Plaintiff averred in her EEO Affidavit that she was unaware of any individuals with the same job title working under the same supervisor who were given at least forty (40) hours of work in a modified limited duty position. (Id. ¶ 84.) However, Plaintiff has asserted that she was treated less favorably than Tammy Penzera ("Ms. Penzera"), who worked as a Part-Time Flexible Clerk, stating as follows in her EEO Affidavit:

> Ms. Penzera suffered an injury to her foot. Ms. Penzera was given multiple job offers for positions which would accommodate her injury. However Ms. Penzera was never assigned to a facility outside of the jurisdiction of the Connellsville Post Office, assigned job duties outside her normal or work hours or was assigned to job duties outside of her craft.

(Id. ¶ 85.) Plaintiff admitted that Ms. Penzera's position is a clerk, not a carrier, and that "while most of Ms. Penzera's restrictions were accommodated, she is not being assigned 40 hours of work per week." (Id. ¶ 86.) Plaintiff also asserted that she was treated less favorably than Carrier Technician Virginia Lowery ("Ms. Lowery"), averring as follows:

> Ms. Lowery underwent surgery. After her return to Connellsville Post Office, Mr. Reynolds assigned her a mounted route that had previously been assigned to me. I was then assigned to the midnight shift at Uniontown Post Office, in violation of Article 13.

---

[18] In response, Plaintiff again states that she is "without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations. . . .[t]herefore, the same are denied." As discussed supra in note 3, Plaintiff's Response does not operate as an effective denial of the facts asserted pursuant to Local Rule 56C of this Court. Accordingly, because Plaintiff's Response fails to dispute the facts set forth in paragraph 82 properly, they will be deemed admitted for purposes of the summary judgment motion. See LCvR 56E (stating that "[a]lleged material facts set forth in the moving party's Concise Statement of Material Facts will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied").

(Id. ¶ 87.)  Plaintiff admitted that Ms. Lowery was not a "T-6," and, therefore, she was assigned

only one route instead of five routes;  further, she admitted that Ms. Lowery's restrictions were

temporary as opposed to permanent.  (Id. ¶ 88.)  In addition, at her deposition, Plaintiff testified

that she was treated less favorably than George ("Timmy") Legarski, who was transferred from

the position of T-6 Floater at the Connellsville Post Office to a supervisory position at the

Uniontown Post Office after suffering an injury.  (Id. ¶ 89.)  Plaintiff testified that "Mr.

Reynolds' treatment of anybody injured varied with what he need[ed] at the moment."  (Id. ¶

90.)[19]

   With regard to Plaintiff's December 15, 2016 EEO complaint, the USPS EEO issued a

Final Agency Decision dismissing Plaintiff's complaint on April 28, 2017.  (Id. ¶ 59.)

Thereafter, Plaintiff filed her complaint in this Court on May 26, 2017, alleging two claims:

discrimination against her due to a disability (Count 1) and retaliation against her for filing a

prior EEO complaint alleging disability discrimination (Count 2).  (Id. ¶ 60; Doc. No. 1 ¶¶ 43-

47.)

   After a period of discovery, Defendant filed its motion for summary judgment with

accompanying brief, concise statement of material facts, and appendix on November 19, 2018.

(Doc. Nos. 45-48.)  After requesting and receiving an extension of time to respond to

Defendant's motion, Plaintiff filed her brief in opposition to Defendant's motion,

counterstatement of material facts, and appendix on February 19, 2019.  (Doc. Nos. 53-55.)

After receiving an extension of time, Defendant filed its reply brief (Doc. No. 59) and

counterstatement of additional material facts (Doc. No. 60) on April 4, 2019.  Accordingly, the

motion has been fully briefed and is ripe for disposition.

---

[19] Plaintiff purports to dispute this statement by pointing to her sworn testimony to the effect that
Postmaster Reynolds discriminated against her based on her disability.  (Doc. No. 53 ¶ 90.)

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251-52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the

non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. See Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. See id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial. See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.  DISCUSSION

Defendant moves for summary judgment on both counts of Plaintiff's complaint alleging discrimination under the Rehabilitation Act: Count 1 alleging disability discrimination and Count 2 alleging retaliation. In connection with the briefing on Defendant's motion, and in light of the arguments raised by Defendant in its initial brief, Plaintiff states in her opposition brief that she voluntarily withdraws her claim of disability discrimination as set forth in Count I of her complaint. (Doc. No. 55 at 3.) Accordingly, the Court limits its discussion to Defendant's potential entitlement to summary judgment as to Plaintiff's remaining claim alleging retaliation for engaging in protected activity.

### A.  Legal Standard Applicable to a Retaliation Claim

The Rehabilitation Act makes the standards articulated by the 1990 Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 et seq., specifically applicable to federal employers. See Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The retaliation provision of the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter." See 42 U.S.C. § 12203(a). Accordingly, "[a]n employer may not take adverse employment actions against an employee because he or she engages in activity protected under the [Rehabilitation] Act, such as the filing of discrimination complaints with the EEOC." See Kondas v. Potter, 328 F. App'x 116, 120 (3d Cir. 2009) (citations omitted).

Retaliation claims under the ADA are analyzed pursuant to the same burden-shifting framework applicable to Title VII claims. See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997). Accordingly, if a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct. See id. at 501. If an employer does so, then the burden returns to the plaintiff "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." See id.

In order to establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show: (1) that she engaged in protected activity; (2) that she suffered an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. See id. The Third Circuit has defined an adverse employment action as one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." See Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (quotations omitted).

With regard to a causal link between the protected activity and an adverse action, "[t]o establish the requisite causal connection, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) an intervening pattern of antagonism coupled with timing to establish a causal link." See

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citations omitted). "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation." See id. (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)). The Third Circuit has stated that, in the absence of temporal proximity, a court "should consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." See Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015) (citations omitted).

As noted above, once a plaintiff establishes a prima facie claim, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged adverse employment action. If an employer does so, the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the reason proffered by the employer was merely a pretext and that retaliation was the real motivation for the employer's action. See Krouse, 126 F.3d at 501. To defeat a motion for summary judgment, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." See Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). In order to sufficiently establish a basis for disbelief, the evidence must indicate "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence . . . .'" See id. (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

## B.    Arguments of the Parties

For purposes of its summary judgment motion as to Plaintiff's claim of retaliation, Defendant concedes that Plaintiff engaged in protected activity by the filing of an EEO complaint; however, Defendant maintains that Plaintiff's retaliation claim nevertheless fails as a matter of law.  (Doc. No. 46 at 23.)  Defendant maintains that Plaintiff fails to establish a prima facie case, arguing that Plaintiff: (1) did not suffer an adverse employment action sufficient to meet the second element because she received workers' compensation benefits for all hours that she was unable to work due to her disability, including "all hours worked fewer than 40 hours per week when suitable work within her restrictions was unavailable;" and (2) cannot sufficiently demonstrate the third element requiring that any reduction in her hours was due to her protected activity.  (Id. at 23-24.)

As to the second element, Defendant notes that "[a]lthough an adverse employment action is broader in the retaliation context than it is in a discrimination suit, the act must still be 'materially adverse' such that it might 'dissuad[e] a reasonable worker from making or supporting a charge of discrimination.'"  (Doc. No. 59 at 2) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006)).  Defendant argues that Plaintiff's claim that she suffered an adverse employment action when she was not provided with forty (40) hours a week of "carrier craft" duties after June of 2016 fails because there is no requirement under the Rehabilitation Act that Defendant provide her with forty (40) hours of work a week within her medical restrictions.  Defendant points to established precedent holding that the Rehabilitation Act does not require an employer to create new positions for disabled employees who cannot perform the essential duties of their positions.  (Id.) (citing Donahue v. Consol. Rail Corp., 224 F.3d 226, 230 (3d Cir. 2000);  Mengine v. Runyon, 114 F.3d 415, 517 (3d Cir. 1997);  Shiring v.

Runyon, 90 F.3d 827, 830-31 (3d Cir. 1996)).  Defendant maintains that in light of Plaintiff's concession that she could not perform the essential functions of the position of T-6 Floater, the USPS was not required by the Rehabilitation Act to create a new full-time position for Plaintiff. (Id.)  Accordingly, Defendant maintains that its failure to create a position that did not otherwise exist cannot constitute an adverse action for purposes of a retaliation claim. (Id.)  In addition, Defendant points to Plaintiff's admission that she received workers' compensation benefits for all hours that she worked less than forty hours a week as a result of her disability and argues that such paid leave "is in itself an accommodation, not an adverse employment action."  (Id. at 2-3) (citing Congleton v. Weil McLain, No. 01-cv-2237, 2003 WL 22100877, at *7 (E.D. Pa. Aug. 19, 2003)).  Accordingly, Defendant maintains that Plaintiff cannot demonstrate that she "suffered a 'materially adverse' action that would 'dissuad[e] a reasonable worker from making or supporting a charge of discrimination.'"  (Id. at 3) (quoting White, 548 U.S. at 67).

As to the third element of a prima facie retaliation claim, Defendant maintains that Plaintiff fails to proffer evidence from which a reasonable factfinder could conclude that the alleged reduction in her hours was due to her protected activity.  (Doc. No. 46 at 24.) Specifically, Defendant maintains that the temporal proximity between Plaintiff's filing of an EEO complaint in or around February of 2016 and the allegedly adverse action – the reduction in her hours that began around July of 2016 – is insufficient to raise an inference of causation.  (Id.) In so arguing, Defendant points to Third Circuit precedent suggesting that a temporal proximity of two months – several months less than the time between the protected activity and alleged adverse employment action here – is not "unusually suggestive" of retaliation.  (Id. at 24) (citing Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004)).

Further, Defendant maintains that there is also "no evidence that USPS engaged in a 'pattern of antagonism'" with regard to Plaintiff. (Doc. No. 46 at 24.) Defendant argues that to the extent that Plaintiff relies on a statement from a union representative to the effect that Postmaster Reynolds was "furious" when he had to reinstate her to her position at the Connellsville Post Office, Postmaster Reynolds admits that he "was (and remains) unhappy with the decision to place Plaintiff in the position of a full-time T-6 Floater in the Connellsville Post Office;" however, Defendant maintains that his reaction is "not discriminatory but merely reflects a legitimate desire for that position to be filled by someone who can perform the essential functions of the job." (Id. at 25.)

Moreover, Defendant argues that, even if Plaintiff was able to point to evidence sufficient to establish a prima facie claim of retaliation, Defendant has articulated a legitimate, non-discriminatory reason for its actions. (Id.) Specifically, Defendant maintains that "USPS has a legitimate basis for not always giving Plaintiff 40 hours of work – that is, her physical limitations restrict the amount of work she is able to do as a carrier at the Connellsville Post Office." (Id.) Further, Defendant points to Postmaster Reynolds' explanation as to "why USPS cannot assign Plaintiff certain tasks, including double casing and delivering Express mail and packages, each and every time Plaintiff demands those assignments" and argues that Plaintiff has presented no evidence to rebut Defendant's legitimate reasons. (Id.)

In response, with regard to whether she has sufficiently established a prima facie case of retaliation, Plaintiff first takes issue with Defendant's argument that she did not suffer an adverse employment action because she received workers' compensation benefits for all hours worked fewer than forty hours a week during the relevant period. Specifically, Plaintiff maintains that "[r]ecord evidence clearly shows that Plaintiff's salary, annual leave, thrift savings plan and

social security contributions were all negatively impacted by the Plaintiff's reduction in hours." (Doc. No. 59 at 4.) Accordingly, Plaintiff argues that this "significant change to [her] salary and benefits package" constitutes "an adverse employment action." (Id.)

Further, Plaintiff maintains that she has sufficiently established the third element of a prima facie case – a causal link between her protected activity and the adverse employment action – because "the totality of the evidence provides the necessary inference." (Id. at 5.) Plaintiff argues that Defendant (or more specifically, Postmaster Reynolds) "had already displayed a pattern of antagonism towards the Plaintiff based on her disability and need for accommodations prior to her EEO complaint," which "only intensified after Plaintiff's reinstatement," after which, Plaintiff maintains, Postmaster Reynolds "engaged in a continuous course of discriminatory conduct" toward her. (Id. at 5-6.) Plaintiff maintains that this course of conduct "eventually culminated in a reduction of Plaintiff's working hours from forty (40) hours per week to approximately twenty-five (25) hours per week." (Id. at 2.)

In support of her position that the totality of the evidence adduced supports a reasonable factfinder's conclusion that she has demonstrated the necessary inference that Defendant's actions towards her were motivated by a retaliatory animus, Plaintiff points to the following facts offered by way of her deposition testimony: Postmaster Reynolds' hostility towards her upon her return to the Connellsville Post Office several months after the filing of her EEO complaint; her belief that Postmaster Reynolds did not permit her to complete job functions that were clearly within her medical restrictions when such work was available during that time period; and the reduction in her hours below forty (40) hours of work per week. (Id. at 6.) Plaintiff notes that the limited duty assignment presented to her approximately one month after her return to the Connellsville Post Office permitted her to case and carry only three of her previous five routes,

and led to the reduction in Plaintiff's hours from forty (40) a week to approximately twenty-five (25) a week.  (Id.)

Plaintiff maintains that the totality of the evidence adduced supports the necessary inference that Defendant's actions towards her were motivated by a retaliatory animus, and moreover, that the record supports a reasonable factfinder's conclusion that Defendant's proffered reason for the reduced hours – that there were not forty (40) hours of work a week that Plaintiff could perform within her medical restrictions at the Connellsville Post Office – was a pretext for discrimination.  (Id. at 7.)  Plaintiff challenges Postmaster Reynolds' explanations as to why he could not or did not assign her certain tasks – such as double casing, delivery of Express Mail, and delivery of parcels – that she maintains she could have performed and would have provided her with additional work hours, maintaining that there are "inconsistencies" in the reasons offered by him sufficient to create a material factual dispute as to whether his actions were taken in retaliation for Plaintiff's filing of an EEO complaint.  (Id. at 8-9.)

**C.    Whether Defendant is Entitled to Summary Judgment on Plaintiff's Retaliation Claim**

As noted above, Defendant disputes whether Plaintiff has sufficiently established the second and third elements of a prima facie claim of retaliation.  However, the Court declines to resolve this issue because even assuming that Plaintiff has demonstrated a prima facie case of retaliation, she has failed to produce sufficient evidence rebutting Defendant's articulated legitimate, non-discriminatory reason for Plaintiff's reduction in work hours – namely, that Plaintiff's physical limitations restricted the amount of work she was able to complete as a carrier at the Connellsville Post Office.

As noted above, for Plaintiff's retaliation claim to survive summary judgment when Defendant has articulated a legitimate, non-discriminatory reason for its action, the burden shifts to Plaintiff to demonstrate pretext by:

> point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes, 32 F.3d at 764. The Court turns to an examination of those pieces of evidence that Plaintiff maintains are sufficient for a reasonable factfinder either to disbelieve Defendant's articulated reason for its reduction in Plaintiff's hours or believe that a discriminatory reason was more likely than not a motivating or determinative factor in Defendant's action. That evidence involves Postmaster Reynolds' dissatisfaction with the decision to reinstate Plaintiff to the position of full-time T-6 Floater in the Connellsville Post Office in June of 2016 and his reasons for not assigning Plaintiff certain tasks within her physical limitations that she maintains she should have been assigned in an effort to provide her with forty (40) hours of work.

As an initial matter, the fact that Postmaster Reynolds admitted that he was "displeased" by Plaintiff's reinstatement to the position of full-time T-6 Floater does not support a reasonable inference that any actions taken by him with regard to Plaintiff subsequent to her reinstatement were based on a retaliatory motive. As noted by Defendant, Postmaster Reynolds testified that his unhappiness with Plaintiff's reinstatement was not based on a reaction to her protected activity but, rather, was reflective of his legitimate desire to fill the T-6 Floater position with someone who could perform all the essential functions of the job. Plaintiff has not pointed to any evidence challenging that stated basis for Postmaster Reynolds' reaction. Accordingly, Postmaster Reynolds' negative reaction to Plaintiff's reinstatement does not provide sufficient evidence from which a reasonable factfinder could infer a retaliatory motive for purposes of

defeating a motion for summary judgment. The Court next addresses Plaintiff's arguments that Postmaster Reynolds' explanation for his post-reinstatement decisions to assign or not assign to Plaintiff certain discrete tasks (which may have provided her with additional work hours) was pretextual.

First, Plaintiff attacks Postmaster Reynolds' explanation for the reason he did not assign Plaintiff to "double case" various routes. Postmaster Reynolds provided two reasons for his decision. The first stated reason was that the task "would require [Plaintiff] to start earlier than her scheduled start time of 07:30," and "[o]ne of Ms. Quarrick['s] restrictions is 'No Overtime.'" (Doc. No. 47 ¶ 70.) Plaintiff argues that Postmaster Reynolds' statement that she was not permitted to work overtime was false because the operative CA-17 permitted her to do so. (Doc. No. 55 at 8.) However, in her Counterstatement, Plaintiff cites only her own deposition testimony and "Exhibit E" to support this statement. As noted supra in note 13, Exhibit E is not a CA-17 reflecting Plaintiff's ability to work overtime on or about the relevant date, but, rather, is a copy of her acceptance of the July 29, 2016 limited duty assignment. (Doc. No. 54-5.) Accordingly, the evidence proffered by Plaintiff fails to demonstrate that Postmaster Reynolds knew that Plaintiff was permitted to work overtime but still refused to assign her the task of double casing. Therefore, the evidence offered by Plaintiff does not suffice to create a material issue of fact as to whether Postmaster Reynolds' explanation was pretextual.

Postmaster Reynolds explained that he also did not often assign double casing to Plaintiff because she was "not a really good caser." (Doc. No. 47 ¶¶ 71-72.) Plaintiff argues that this explanation is pretextual because Postmaster Reynolds' opinion was based only on his personal observations of Plaintiff's casing abilities on two (2) occasions over four (4) years, rather than on any "empirical data," such as a "time study on the Plaintiff's casing ability as compared to

another carrier." (Doc. No. 55 at 8.) However, as Defendant correctly notes, whether

Postmaster Reynolds made as thorough an investigation of Plaintiff's relative casing abilities as

he could have done is an insufficient basis to create a material factual dispute as to whether the

stated reason for Postmaster Reynolds' decision was pretextual. See Fuentes, 32 F.3d at 765

(stating that "the factual dispute at issue is whether discriminatory animus motivated the

employer, not whether the employer is wise, shrewd, prudent, or competent").

Next, Plaintiff claims that Postmaster Reynolds' explanation that he could not assign

Plaintiff Express Mail deliveries was pretextual, based on her testimony that Postmaster

Reynolds assigned those duties to other individuals instead of her when she was available to

perform them. (Doc. No. 55 at 8.) She similarly challenges his explanation that he assigned

parcel deliveries to the carrier assigned to the particular route and that Plaintiff's restrictions on

lifting and walking limited her ability to perform this task as pretextual, maintaining that she was

not assigned such duties when she was available. (Id.) As noted by Defendant, Plaintiff's

deposition testimony is insufficient to cast doubt on Postmaster Reynolds' explanation that,

although he sometimes assigned such tasks to Plaintiff, he often assigned the work to other

employees.

At bottom, Plaintiff's effort to demonstrate that Postmaster Reynolds' explanation as to

why he did not assign her these several discrete tasks subsequent to her reinstatement (which

may have permitted her to increase her working hours) is pretextual is supported only by

Plaintiff's testimony that she believed she, rather than other employees, should have been

assigned these tasks. This testimony is not sufficient evidence to support a reasonable

factfinder's conclusion that Postmaster Reynolds' explanation was pretextual. See Gardner v.

Sch. Dist. of Phila., 636 F. App'x 79, 86 (3d Cir. 2015) (stating that "[b]ecause the ultimate

question is whether discriminatory animus determined the employer's action, an employee cannot discredit the employer's proffered reason simply by showing that the employer's decision was 'wrong or mistaken'").  Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's retaliation claim.

## IV.     CONCLUSION

For all of the reasons discussed above, Defendant's motion for summary judgment (Doc No. 45) will be granted.  An Order consistent with this Memorandum follows.